IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

| | |
|---|---|
| TRISH TOMPKINS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Case No. 2:09-cv-0111 |
| | )   Judge Trauger |
| STEVE WILBUR, individually, as a deputy | ) |
| sheriff for Pickett County, Tennessee,[1] | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM

Pending before the court is the defendant's Motion for Summary Judgment (Docket No. 14), to which the plaintiff has responded (Docket No. 20), and the defendant has filed a reply in support (Docket No. 22). For the reasons discussed herein, this motion will be granted, and this case will be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

This is a Section 1983 case in which the plaintiff, Trish Tompkins, alleges that the defendant and Pickett County, Tennessee sheriff's deputy, Steve Wilber, improperly detained her on April 14, 2009 and May 31, 2009.[2] At approximately 4:00 p.m. on April 14, 2009, the Pickett

---

[1]In his Answer, defendant Wilber corrects the spelling of his last name. (Docket No. 7.)

[2]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 16 and 21 ) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

1

County Sheriff's Department received a call from the plaintiff's mother-in-law stating that the plaintiff had left the mother-in-law's residence and "was possibly under the influence." (Docket No. 21 at 1.)

Shortly thereafter, Wilber spotted the plaintiff's car in the parking lot of Neal's Package Store. Wilber observed the car turn right, heading south on Highway 111, and he radioed to Deputy Bill Harmon, who was southbound on Highway 111, that the plaintiff was coming his way. Harmon spotted the plaintiff driving passed him, pulled in behind her, activated his blue lights, and pulled the plaintiff over. Wilber arrived at the scene of the stop in his patrol car shortly thereafter. The deputies both approached the vehicle and asked the plaintiff to step out.

The plaintiff exited her car slowly; she was holding her stomach, and the defendant observed that she was wearing a hospital bracelet. The plaintiff informed the deputies that she had just had surgery, and the deputies, therefore, asked the plaintiff to get back in the car. Once she was back in the car, the defendant performed an eye nystagmus test to determine if the plaintiff was under the influence of alcohol or medication, and the plaintiff failed that test. During the course of the stop, the deputies also observed prescription medication in pharmacy bags on the floor of the plaintiff's car. The deputies asked for the plaintiff's consent to search the bags, and that consent was granted. The officers examined the prescription bottles but did not open them. (Docket No. 15 Ex. 1 at 3.)

The deputies concluded that, in light of the plaintiff's surgery and the failed eye test, she should not be driving. Deputy Harmon asked the plaintiff if someone could come and pick her up. The plaintiff called a friend who lived close by, and she came to drive the plaintiff home. The plaintiff was not arrested or cited, and, according to a video recording of the incident taken

from the defendant's police car, the entire stop (including time waiting for the plaintiff's friend to arrive) took 22 minutes.

The second stop took place during the afternoon of May 31, 2009, when Wilber was driving south on Highway 127 and passed the plaintiff's vehicle, which was traveling north.[3] Wilber claims that, at this time, he observed the driver's side tires of the plaintiff's car to be over the yellow line dividing the road. (Docket No. 15 Ex. 1 at 4.) Wilber turned around and began following the plaintiff, who was driving with her boyfriend, Josh Turner, and his father, Tonie Turner, in the car. Wilber claims that he observed the plaintiff repeatedly swerve back and forth within the lane and that he also saw the car pass over the "fog line" on the shoulder of the road before swerving back into the lane. (*Id.*) After following the plaintiff for a time, Wilber activated his blue lights to pull the plaintiff over.

At her deposition, the plaintiff testified that, while Wilber was driving toward her, she did inadvertently cross the fog line and begin to drive on the rumble strip. (Docket No. 22 Ex. 2 at 88-89.) Alarmed by the sound made by driving over the bumps in the rumble strip, she

---

[3]In her Complaint, the plaintiff alleged that she had been stopped by Wilber three times, with an intervening stop occurring on April 24, 2009. (Docket No. 1 at 3.) Now, however, the plaintiff concedes that Wilber was not on duty that day. (Docket No. 21 at 5.) Additionally, throughout her deposition, the plaintiff claimed that she had been stopped multiple times by various deputies, including Wilber (with whom she was reasonably well acquainted prior to the events giving rise to this case), and she implied that she had been harassed by the Pickett County Sheriff's Department at the request of the plaintiff's husband (the plaintiff and her husband were divorcing at the time). (*See* Docket No. 22 Ex. 2 at 36-42.) The plaintiff was generally vague about these other stops (in contrast to her ability to remember specific details about the April 14 and May 31 stops) and, after repeated questioning, she speculated that Wilber had stopped her on two occasions besides the 14th and the 31st, but both those stops were very brief, once to inquire whether the plaintiff had been drinking (in conjunction with a drunk driving investigation) and once to issue a speeding warning. (*Id.* at 110-112.) The plaintiff has not advanced Section 1983 claims based upon these stops or discussed them in briefing here.

"obvious[ly]" swerved back into her lane. (*Id.* at 89.) The plaintiff also "acknowledges touching the yellow line at a very narrow place in the roadway on Highway 127." (Docket No. 21 at 6.) The plaintiff testified that, all tolled, Wilber followed her for about 4.5 miles – three miles on Highway 127 and then 1.5 miles on Highway 111. (Docket No. 22 Ex. 2 at 89-90.)

Just before he pulled the plaintiff over, Wilber called Deputy Jeff Flowers to advise him that he would need assistance with a stop. Flowers indicated that he was one mile from the location where Wilber ultimately pulled the plaintiff over. Wilber claims that Flowers thus arrived on the scene of the stop just 30 or 40 seconds after Wilber did. The plaintiff, however, claims that, after the stop, it took at least 30 minutes for Flowers to arrive, and she simply sat in her car for 30-45 minutes waiting for the investigation to begin. (Docket No. 22 Ex. 2 at 94.) The plaintiff does not dispute that any delay in commencing the investigation after the stop was to allow Deputy Flowers to arrive to aid in the administration of sobriety tests.[4]

After Flowers arrived, Wilber asked the plaintiff to exit her car. At that time, Wilber and Flowers administered three sobriety tests – the eye nystagmus test (administered by Flowers), the heel-to-toe walk, and the stand-on-one-leg test (both administered by Wilber). Wilber claims that the plaintiff again failed the eye nystagmus test, had difficulty performing the heel-to-toe walk (but this may have been because of the heat of the pavement and the shoes worn by the plaintiff), and he cannot recall the results of the third test.

---

[4]An audio and video recording of the stop, recorded from Flowers' car, was filed by Wilber in support of his motion. (Docket No. 15 Ex. 6.) Wilber claims that his dashboard camera also recorded the stop, but "because no arrest was made . . . the recording was subsequently deleted when the memory on my video camera was full." (Docket No. 15 Ex. 1 at 7.) Therefore, video evidence cannot resolve the dispute regarding the length of the May 31, 2009 stop.

4

Following a few minutes of questioning regarding whether the plaintiff was on any prescription medications, the deputies asked the plaintiff if they could search the car. Specifically, one deputy (it is not entirely clear which one) said to the plaintiff "care if we search the vehicle," to which the plaintiff ambiguously replied "Yep" and proceeded to walk back to her car and open the rear hatch for the officers. (Docket No. 15 Ex. 6.) Just prior to performing the search, Wilber and Flowers asked Josh and Tonie Turner to exit the car, and they did. (Docket No. 15 Ex. 7 at 10-14.) Although not raised as an issue here, the officers apparently also patted down the plaintiff and the Turners and directed the Turners to empty their pockets. (*Id.*)

After performing the tests and conducting the search, the officers concluded that (in light of her failed eye test) it was not safe for the plaintiff to drive. After determining that Tonie Turner had recently consumed a beer in the car, they asked Josh Turner if he could drive, and he agreed to do so. (Docket No. 22 Ex. 2 at 106.) No arrests were made. From the time that Flowers arrived until Turner drove off with the plaintiff and his father, about 12 minutes elapsed. (Docket No. 15 Ex. 6.) Again, the plaintiff claims that at least 30 minutes elapsed waiting for Flowers and that the entire stop took at least 45 minutes. (Docket No. 21 at 8.) Tonie Turner testified that the entire stop took 10-15 minutes, and he provided no indication that there was a lengthy delay waiting for a second officer to arrive. (Docket No. 15 Ex. 7 at 10-15.)[5]

---

[5]Some time shortly after Turner drove off, Wilber realized that he had not returned the plaintiff's driver's license. (Docket No. 15 Ex. 1 at 7.) Wilber stated that he arranged for the driver's license to be returned to the plaintiff by the deputy working the night shift on May 31st, and, as far as he knows, the license was so returned. (*Id.*) The plaintiff claims that the driver's license was not returned until June 3rd, but she concedes that she made little effort to get her driver's license back – only calling "Officer Clois Brown" on one occasion. (Docket No. 22 Ex. 2 at 119-120.) The record does not indicate that the defendant did anything more than merely forget to return the plaintiff's license, and there is no indication from the record that any delays in returning the license are attributable to the defendant.

5

On November 19, 2009, the plaintiff filed her Complaint against Wilber, alleging that he had violated her rights under Section 1983 and asserting common law claims of assault and battery, intentional infliction of emotional distress, and false arrest. (Docket No. 1.) Wilber has moved for summary judgment on all claims. (Docket No. 14.)

## **ANALYSIS**

I.  **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II. Qualified Immunity

As discussed herein, Wilber claims that he is entitled to qualified immunity. Under the doctrine of qualified immunity, government officials performing discretionary functions "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Generally, the qualified immunity inquiry involves first, determining whether a constitutional or statutory violation occurred, and, if so, then determining if the right infringed was clearly established. *McKinley v. City of Mansfield*, 404 F.3d 418, 429-30 (6th Cir. 2005). However, courts should use their discretion and may consider the issue of whether the right was clearly established first, if such an analysis is appropriate "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

In qualified immunity analysis, government officials performing discretionary functions are entitled to "the benefit of the doubt." *Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996). Therefore, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Once the defendant claims that qualified immunity applies, it is the plaintiff's burden to demonstrate that the doctrine should not apply – that is, to sufficiently show that a constitutional violation occurred and that the law at issue was "clearly established" by the relevant time period. *Hughes v. City of N. Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996).

## III. Wilber's Motion for Summary Judgment

### A. Section 1983 Claims

Both stops at issue here were brief investigatory detentions that did not result an arrest, also known as *Terry* stops. *See Terry v. Ohio*, 392 U.S. 1, 9 (1968). The protections of the Fourth Amendment "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002). The constitutionality of such an investigatory stop is evaluated under a two-part analysis. *U.S. v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010). First, the court must determine if there was a "reasonable basis" for the stop, and, second, the court must determine if "the degree of intrusion" caused by the stop was "reasonably related in scope to the situation at hand." *Id*.

On the first, reasonable basis prong, an officer has a "reasonable basis" for a stop and brief detention when the "officer has reasonable, articulable suspicion that a person has been, is, or is about to be engaged in criminal activity." *Id.* (internal quotation omitted). A reasonable suspicion is somewhere between a "mere hunch" and the probable cause required to make an arrest. *U.S. v. Guajardo*, 2010 WL 3069605, *5 (6th Cir. Aug. 5, 2010).

On the second, degree of intrusion prong, "the stop must last no longer than is necessary to effectuate the purpose of the stop, and the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* (internal quotation and citation omitted). The officer may ask a "moderate number of questions" to confirm or allay his suspicions, but "once the purpose of the traffic stop is completed," the motorist must be released, "unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *Id.* Both prongs of the analysis are fact-intensive, and the officer's conduct is evaluated

based on the "totality of the circumstances." *See Arvizu*, 534 U.S. at 273.

### i. April 14, 2009 stop

The plaintiff all but concedes that the April 14, 2009 stop did not run afoul of *Terry*. The plaintiff acknowledges that, in light of her mother-in-law's phone call to the sheriff's department, it was reasonable of Harmon and Wilber to pull her over. (Docket No. 21 at 4; Docket No. 22 Ex. 2 at 81-82.) Much more than a mere "hunch," Wilber had a specific and credible basis for a reasonable belief that the plaintiff was engaging in criminal activity, that is, driving while impaired, when he participated in the April 14, 2009 *Terry* stop.

Moreover, there is no indication that the stop was longer than necessary or that the investigatory means used were overly intrusive. The officers immediately noticed that the plaintiff was struggling with the effects of her surgery and asked her to remain in her car. They then asked, and received, consent to look at the prescription bottles on the floor of the car. After examining those bottles and administering the eye test, they determined that someone should drive the plaintiff home. The remainder of the relatively brief stop was spent waiting for the plaintiff's ride to arrive. There is no suggestion that the officers unnecessarily delayed the process or otherwise acted unreasonably.

Indeed, the plaintiff's brief discussion[6] of the April 14, 2009 stop in her response simply recites the facts of the stop, claims that this was not a "classic" *Terry* stop because the reasonable suspicion was raised by a phone call (not an observation) and claims that, during the stop, the plaintiff was "terrified" that she might be arrested. (Docket No. 20 at 2.) The investigatory nature of the stop places this incident squarely within the scope of *Terry*, and the plaintiff's

---

[6]The plaintiff's response itself is brief, at just over two pages. (Docket No. 20).

argument here does not challenge that (1) the officers had reasonable suspicion or (2) that the duration of the stop was reasonable under the circumstances. *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008)("In examining the totality of the circumstances, it is important to note that the officer's reasonable suspicion need not arise exclusively from his own direct observations. Rather, it can be derived from such sources as informant tips, dispatch information, and directions from other officers.") This stop did not run afoul of *Terry* as a matter of law.

### ii. May 31, 2009 stop

The May 31, 2009 stop is a slightly closer question, but the court again finds insufficient evidence of a constitutional violation to move forward with the qualified immunity inquiry. Here, on the first prong of *Terry*, the issue of reasonable suspicion again concerns whether Wilber had sufficient evidence that the plaintiff was driving while impaired. (Docket No. 15 at 13.)

The Sixth Circuit has broadly recognized that an officer's observations of isolated swerving and lane crossing is sufficient for the officer to have reasonable suspicion of impairment. *Gaddis v. Redford Township*, 364 F.3d 763, 771 (6th Cir. 2004)(two swerves making contact with the dividing line sufficient for reasonable suspicion as a matter of law); *U.S. v. Zabawa*, 134 Fed Appx. 60, 62 (6th Cir. 2005)(an incident of crossing the fog line sufficient for an officer to instigate the stop); *Guajardo*, 2010 WL 3069605, at *5 (reasonable suspicion established when officer "observed defendant's car brake and swerve . . . saw defendant's car cross the fog line three times in a relatively short distance, and noted that defendant was traveling at well-below the posted speed limit.")

Here, Wilber claims that he observed the plaintiff: (1) steadily driving across the center

line, (2) swerving within the lane, and (3) passing over the fog line and swerving back onto the road. While the plaintiff does not concede to this much swerving and erratic driving, she does concede that she "touched" the yellow line and swerved obviously after passing over the fog line. Also, just six weeks earlier, Wilber had stopped the plaintiff driving immediately after surgery, in obvious pain, and she was unable to pass the eye test. In light of all of this, the court must conclude that Wilber had reasonable suspicion that the plaintiff was driving while impaired.

On the second prong of *Terry*, there is nothing to indicate that the 12-minute stop that was recorded on Flowers' dashboard camera was unreasonable in length. Again, Wilber and Flowers administered three sobriety tests, asked the plaintiff a series of questions about whether she was on any prescription medications, and conducted a brief search of the car and its occupants. (Docket No. 15 Ex. 6.) That is, once Flowers arrived, there is nothing to indicate that the defendant engaged in conduct that unreasonably lengthened the stop or that was outside the scope of an investigation into impaired driving.

The plaintiff has repeatedly claimed that there was a more than 30-minute period after she was pulled over in which she sat in her car waiting for Flowers to arrive. (Docket No. 20 at 2.) Again, this version of events is not supported by the other testimony in this case, including that of Tonie Turner. Additionally, there is nothing in the recording of the stop to suggest that an extensive wait period had preceded the investigation. (Docket No. 15 Ex. 6.)

Even if the plaintiff's version is credited, she still would not have sufficiently shown that the defendant violated her rights under *Terry*. The Supreme Court has recognized that there is "no rigid time limitation" for *Terry* stops, and, as long as there is a reasonable justification for

11

any delays, detentions and waits (even exceeding an hour) are generally permissible. *U.S. v. Sharpe*, 470 U.S. 675, 685 (1985); *Guajardo*, 2010 WL 3069605, at *7 (25-minute traffic stop clearly reasonable); *Gallegos v. City of Los Angeles*, 308 F.3d 987, 992 (9th Cir. 2002)(where there was no evidence of "unnecessary" delay, a detention of "forty-five minutes to an hour" did not impinge on *Terry* rights). Here, there is no dispute that Wilber called for backup to assist him with the sobriety tests and was assured that Flowers was very close by. It was reasonable in terms of officer safety for him to await backup, as there were three individuals in the car he had stopped. To the extent that, somehow, it took 30-45 minutes for Flowers to arrive, that delay was outside of Wilber's control and, therefore, does not impact the reasonableness of the stop. *See U.S. v. Leal*, 235 Fed. Appx. 937, 942 (3rd Cir. 2007)(80 minute delay in arrival of canine unit that was caused by traffic was permissible under *Terry*). Therefore, even crediting the plaintiff's version of events, she has not raised a genuine issue of fact on this point.

As neither stop ran afoul of *Terry* as a matter of law, it is not necessary to reach the "clearly established" issue. The defendant is entitled to qualified immunity and summary judgment on the plaintiff's Section 1983 claim.[7]

---

[7]While the plaintiff does not raise the issue in her response, she has disputed elsewhere that she gave consent to the May 31, 2009 search, arguing that her "yep" literally refused consent. (Docket No. 22 Ex. 2 at 102.) While, as noted above, a motion for summary judgment typically requires the court to view all facts in the light most favorable to the nonmoving party, the existence of a recording depicting the incident can alter this standard. A recording that contains clear and relevant information about an incident should be used and relied upon by the court, even when contradicting the facts stated by the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Upon viewing the recording, it is clear that the plaintiff's perky response to the "care if we search the vehicle" inquiry and her opening of the rear hatch demonstrated consent. As the warrantless search was consensual, it was permissible under the Fourth Amendment. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

B.     **State Law Claims**

Among other grounds, the defendant, in light of the absence of a viable federal claim, asks the court to decline to exercise supplemental jurisdiction over the state law claims. (Docket No. 15 at 16.) The plaintiff offers no support for the state law claims in her response. (Docket No. 20.)

A federal district court "may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). District courts are generally considered to have broad discretion in this arena. *See Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir. 1997); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). That said, given the "constitutional and prudential limits on the use of federal judicial power," the "balance of considerations" (considerations including judicial economy, convenience, fairness, and comity) for the district court will usually point "to dismissing the state law claims" in a federal question case in which no federal cause of action remains. *Musson*, 89 F.3d at 1254-55; *see also Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991) (finding that "overwhelming interests in judicial economy" should be in play before the district court exercises its discretion to decide a pendant state court claim after the federal claim has been dismissed pre-trial.)

As no compelling basis has been brought forth for exercising supplemental jurisdiction over these claims, the court will dismiss them and dismiss the entire case.

## **CONCLUSION**

For the reasons discussed herein, the defendant's Motion for Summary Judgment will be granted; that is, the court will dismiss the plaintiff's Section 1983 claim on the merits and decline to exercise supplemental jurisdiction over the remaining state law claims.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge